UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PERRY SHERMAN,

        Petitioner,                        Hon. Paul L. Maloney

v.                                                Case No. 1:06-CV-369

CAROL HOWES,

        Respondent.
_____/

**REPORT AND RECOMMENDATION**

This matter is before the Court on Sherman's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Sherman's petition be **denied**.

**BACKGROUND**

As a result of an incident which occurred on or about February 26, 2000, Petitioner was charged with first degree murder and possession of a firearm during the commission of a felony. (Trial Transcript, October 23, 2000, 18). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Dr. Leigh Lhlavaty**

As of March 9, 2000, Dr. Lhlavaty was employed as a forensic pathologist with the Wayne County Medical Examiner's Office. (Trial Transcript, October 24, 2000, 47-48). On that date, Dr. Lhlavaty performed an autopsy on Robert Glenn Card. (Tr. 48). This examination revealed that Card suffered seven gunshot wounds. (Tr. 49). The doctor recovered three bullets from Card's body. (Tr. 49-56). Dr. Lhlavaty determined that Card "died of multiple gunshot wounds with complications" and characterized his death as a homicide. (Tr. 49, 58). Of the seven bullets that struck Card, five entered his body from the rear. (Tr. 49-56).

**David Jones**

At approximately 7:00 p.m. on February 26, 2000, Jones and Robert Card walked from Card's residence to Candice Gibson's residence across the street. (Trial Transcript, October 24, 2000, 65-68). After Card crossed the street, he encountered Petitioner and Petitioner's brother, Tadarrel Campbell, both of whom were sitting on the porch of Gibson's residence. (Tr. 68-70). Card asked Petitioner "why was he shooting on the side of his mother's house?" (Tr. 69). Petitioner did not respond. Card then asked the same question of Campbell who also declined to answer. (Tr. 69). Jones and Card turned around and began walking towards Jones' vehicle, at which point Jones heard "six or seven" gunshots. (Tr. 70-71). Jones and Card ran to Jones' car. (Tr. 71). After getting inside the vehicle, Jones realized that Card had been shot. (Tr. 71-72). Jones then drove Card to a nearby hospital. (Tr. 71-72). Neither Jones nor Card were armed at the time of this encounter. (Tr. 72-73). Neither man struck Petitioner or Campbell or engaged in "any physical confrontation" prior to the shooting. (Tr. 72).

**Kenneth Card**

Kenneth Card was Robert Card's younger brother. (Trial Transcript, October 24, 2000, 115). On the evening of February 26, 2000, Kenneth Card was inside his residence with his friend, London Nathon. (Tr. 115-16). Card's residence was "right across the street" from Candice Gibson's residence. (Tr. 115-16). At approximately 7:00 p.m. that evening, Kenneth heard his brother Robert ask, "why did you shoot on the side of my mother's house?" (Tr. 116). Kenneth then heard arguing outside. (Tr. 116-18). Approximately "10 to 15 seconds" after the arguing stopped, Kenneth heard gunshots. (Tr. 118). Kenneth looked outside and witnessed Petitioner and Tadarrel Campbell firing handguns at his brother Robert, as Robert and David Jones ran towards Jones' car. (Tr. 118-21). Kenneth heard Petitioner and Campbell fire "between 10 and 15 shots." (Tr. 122).

**Scott Shea**

As of February 26, 2000, Shea was employed as a police officer for the City of Detroit. (Trial Transcript, October 24, 2000, 173-74). At approximately 7:30 p.m. that evening, Shea was dispatched to a local hospital to investigate the shooting of Robert Card. (Tr. 174-77). When Officer Shea asked Card who shot him, Card responded, "Perry shot me." (Tr. 185).

**London Nathon**

On the evening of February 26, 2000, Nathon was at Kenneth Card's residence. (Trial Transcript, October 24, 2000, 197-99). Between 7:00-7:30 p.m., Nathon heard David Jones say that Robert Card "was back." (Tr. 199). When Nathon heard this, he looked out a window and

3

witnessed Petitioner, Tadarrel Campbell, and Candice Gibson sitting outside Gibson's residence. (Tr. 199-202). Nathon also saw Jones and Card walking toward Petitioner and Campbell. (Tr. 202-03). Nathon turned away and subsequently heard gunshots. (Tr. 199-200, 203). Nathon immediately looked back out the window and witnessed Petitioner and Tadarrel Campbell shooting at Robert Card with handguns. (Tr. 203-06). Nathon heard 8 or 9 shots fired. (Tr. 208-09).

**Souandrea Hardwick**

Between 7:00 and 7:30 p.m. on February 26, 2000, Hardwick was driving to Robert Card's residence. (Trial Transcript, October 24, 2000, 249-50). As Hardwick approached Card's residence she observed him standing outside Candice Gibson's residence. (Tr. 253-54). Hardwick also saw David Jones, Petitioner, and another man, who she did not recognize, standing near Card. (Tr. 254). It appeared that the men "were having a conversation." (Tr. 255). Card and Jones then turned and began walking away, at which point Petitioner and his companion began shooting at Card. (Tr. 255-56). Hardwick saw Petitioner fire his weapon "five or six times." (Tr. 256). Card and Jones ran to Jones' car and drove away. (Tr. 256-59). Hardwick did not observe Card or Jones "do anything physical" towards Petitioner or his companion prior to the shooting. (Tr. 261).

**Nathan Johnson**

As of February 26, 2000, Johnson was employed as a police officer for the City of Detroit. (Trial Transcript, October 25, 2000, 9). At 7:35 p.m. that evening, Officer Johnson was dispatched to Candice Gibson's residence to investigate a shooting. (Tr. 9-11). When he arrived at the scene, Officer Johnson observed "shell casings scattered across the lawn." (Tr. 11). Johnson

4

secured the area until an evidence technician arrived to process the crime scene.  (Tr. 11-13).

**Michael Choukounan**

As of February 26, 2000, Choukounan was employed as an evidence technician for the City of Detroit. (Trial Transcript, October 25, 2000, 27-28). Officer Choukounan arrived at Candice Gibson's residence at approximately 9:30 p.m. that evening to process the crime scene. (Tr. 28). Choukounan recovered "six spent shell casings and one live round of ammunition." (Tr. 29). He also recovered a beer bottle on which Robert Card's fingerprint was discovered. (Tr. 32, 55).

**Paula Sherman**

Sherman is Petitioner's mother and Tadarrel Campbell's step-mother. (Trial Transcript, October 25, 2000, 87). On December 31, 1999, Sherman witnessed Robert Card stop his vehicle next to Petitioner, who was standing outside their residence. (Tr. 93-94). After stopping his vehicle, Card rolled down his window, pointed a gun at Petitioner and stated, "I'll get you." (Tr. 94). Sherman did not report this incident to the police. (Tr. 96).

**Candice Gibson**

Gibson had been Petitioner's girlfriend since approximately October 1999. (Trial Transcript, October 25, 2000, 98). At approximately 7:00 p.m. on February 26, 2000, Petitioner and Tadarrel Campbell arrived at her residence. (Tr. 99-100). The trio were sitting outside on the porch when Robert Card and David Jones approached approximately 15 minutes later. (Tr. 100-08). As Card and Jones approached, Card asked "why were you shooting outside my mother's house?" (Tr. 108). Gibson instructed Petitioner and Campbell to ignore Card, which they did. (Tr. 108-09). Card responded, "okay, y'all bitches, y'all think you want to ignore me now, all right." (Tr. 110).

Card and Jones then walked back to Card's residence. (Tr. 109-10).

Approximately one minute later, Card and Jones returned to Gibson's residence. (Tr. 111). Card began yelling at Petitioner, "asking him why was he shooting on the side of his house." (Tr. 112). Card kept repeating his question because Petitioner would not answer. (Tr. 112-13). At this point, Gibson told Card "that he was disrespecting my house and my grandmother is quick to call the cops, so lower his voice." (Tr. 113). Card "began" to comply with Gibson's request, but "then he started yelling" and said, "fuck these two hoe-ass niggas," referring to Petitioner and Campbell. (Tr. 113). Card then approached Campbell and said, "oh, but you with your bitch ass, why are you riding around here burning rubber?" (Tr. 113). Campbell told Card, "I'm not doing anything to you, it's a free country, I can do what I want." (Tr. 114). Card responded, "you think you're big and bad, what you want to do about it? You want to fight about it? You want to gun it out?" (Tr. 114). Card then struck Campbell with a beer bottle, immediately after which gunshots were fired. (Tr. 114-15). Gibson heard "over eight" shots fired. (Tr. 126). Card and Jones then ran away. (Tr. 115-17).

**Perry Sherman**

Petitioner testified that he was afraid of Robert Card. (Trial Transcript, October 25, 2000, 134). Card had threatened Petitioner and attempted to run him off the road. (Tr. 134). Card also "pulled a gun" on him on one occasion. (Tr. 134). Card and David Jones would also "say certain stuff" and "try to fight" Petitioner and his brothers "for any apparent reason." (Tr. 133-34).

At approximately 7:15 p.m. on February 26, 2000, Petitioner and Tadarrel Campbell arrived at Candice Gibson's residence. (Tr. 134-37). Petitioner was dating Gibson at the time. (Tr.

7

136).  Petitioner was carrying a gun to protect himself from Jones and Card.  (Tr. 135).  Petitioner, Campbell, and Gibson sat outside on the porch "having a conversation."  (Tr. 137).  Approximately five minutes later, Card and Jones approached and began "cussing at" Petitioner and Campbell.  (Tr. 138).  Card then asked why Petitioner had been "shooting by [his] mother's house."  (Tr. 138).  Gibson told Petitioner "not to say anything."  (Tr. 139).  In response to being ignored by Petitioner and Campbell, Card stated "you bitch ass niggas want to ignore me, okay, cool."  (Tr. 139-40).  Card then walked across the street.  (Tr. 140).

    Petitioner, Campbell, and Gibson remained on the porch talking.  (Tr. 140).  Card and Jones soon returned.  (Tr. 140).  When Card returned, he "started asking the same question again."  (Tr. 140).  Petitioner did not respond because he "didn't know what [Card] was talking about."  (Tr. 140-41).  Card then spoke to Campbell, who responded, "I'm not messing with anybody over here."  (Tr. 141-42).  Card then struck Campbell with a beer bottle.  (Tr. 141-42).  Petitioner then heard a gunshot.  (Tr. 142-43).  Petitioner did not know who fired the shot, but he nonetheless drew his weapon and began shooting.  (Tr. 143).  Petitioner fired "at least" five or six shots.  (Tr. 144).  As Petitioner fled the scene he looked back and saw Jones firing a weapon.  (Tr. 145).

    Following a jury trial, Petitioner was acquitted of first degree murder, but convicted of second degree murder and possession of a firearm during the commission of a felony.  (Trial Transcript, October 30, 2000, 3-4).  Petitioner was sentenced to serve 15-25 years on the murder conviction and two years on the possession of a firearm during the commission of a felony conviction. (Sentencing Transcript, November 13, 2000, 16-17).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I.  Appellant was denied a fair trial where the jury was permitted to consider the charge of premeditated

8

>   murder even though it was unsupported by legally sufficient evidence, thus resulting in an improper compromise verdict.
>
> II. The trial court denied Appellant a fair trial by failing to instruct the jury on the lesser included offense of voluntary manslaughter. In the alternative, Appellant was denied effective assistance of counsel who was denied the instruction because he did not request it until after closing argument.
>
> III. The trial court erred reversibly in admitting decedent's purported statement to a police officer that he had been shot by appellant as an excited utterance.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Sherman*, No. 231994, Opinion (Mich. Ct. App., Aug. 16, 2002). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Sherman*, No. 122503, Order (Mich., Jan. 31, 2003). Petitioner later filed in the trial court a motion for relief from judgment in which he asserted the following claims:

> I. The trial court erred by failing to instruct the jury on the requested lesser included offense of voluntary manslaughter.
>
> II. Defendant was denied the effective assistance of counsel where trial counsel failed to move for an instruction on voluntary manslaughter in a timely fashion.

The trial court denied Petitioner's motion. *People v. Sherman*, No. 00-004388-01 (Third Cir. Ct., Criminal Div., Feb. 24, 2004). Asserting the same two issues, Petitioner moved in the Michigan Court of Appeals for leave to appeal. The court denied Petitioner's motion "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Sherman*,

9

No. 260939 (Mich. Ct. App., Sep. 21, 2005). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. Petitioner's motion was denied because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Sherman*, No. 129881 (Mich., April 28, 2006). On May 30, 2006, Petitioner initiated the present action in which he asserts the following claims:

> I. Petitioner was denied a fair trial where the jury was permitted to consider the charge of premeditated murder even though it was unsupported by legally sufficient evidence, thus resulting in an improper compromise verdict.
>
> II. The trial court denied Petitioner a fair trial by failing to instruct the jury on the lesser included offense of manslaughter, and Petitioner was denied the effective assistance of counsel who was denied the instruction because he did not request it until after closing argument.

## **STANDARD OF REVIEW**

Sherman's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> >
> > (2) resulted in a decision that was based on an

> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively*

11

unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority.  The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law.  *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct.  *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)).  Petitioner can rebut this presumption only by clear and convincing evidence.  *Id.*

## ANALYSIS

**I.        Due Process**

As noted above, Petitioner was charged with first degree murder.  Petitioner was acquitted of first degree murder, but convicted of second degree murder.  Petitioner claims that there did not exist sufficient evidence to submit the charge of first degree murder to the jury.  While

Petitioner was acquitted of this charge, he argues that the submission to the jury of the charge of first degree murder resulted in an improper compromise verdict, thereby depriving him of the right to due process.

Petitioner is entitled to habeas relief only if he can establish that his conviction and incarceration violates clearly established federal law as articulated by the United States Supreme Court. The Supreme Court has long held that every criminal defendant has a right not to be convicted of a crime unless there exists evidence "sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." *In re Winship*, 397 U.S. 358, 363 (1970). As several courts have recognized, however, "the Supreme Court has never held that the submission of a charge, upon which there is insufficient evidence, violates a defendant's constitutional rights where the defendant is acquitted of that charge." *Thomas v. Bell*, 2008 WL 268892 at *5 (E.D. Mich., Jan. 29, 2008) (citations omitted); *Olivo v. Lafler*, 2007 WL 1747154 at *3 (E.D. Mich., June 18, 2007) (recognizing that "a number of cases have held that the submission to a jury of a criminal charge constitutes harmless error where the habeas petitioner is acquitted of that charge") (citations omitted); *Calderon-Hernandez v. Trombley*, 2007 WL 4181274 at *5 (E.D. Mich., Nov. 27, 2007) (same) (citations omitted).

Thus, Petitioner cannot establish that the submission to the jury of the charge of first degree murder violates clearly established law as articulated by the United States Supreme Court. Moreover, Petitioner's claim is premised on the assertion that it was improper to submit this charge to the jury because it was not supported by the evidence. The evidence presented at trial, however, supports the trial court's decision to submit the charge of first degree murder to the jury.

Under Michigan law in effect at the time of Robert Card's killing, an individual was

guilty of first degree premeditated murder if the following elements were satisfied: (1) the defendant intentionally killed the victim, and (2) the killing was deliberate and premeditated. *People v. Wofford*, 492 N.W.2d 747, 749 (Mich. Ct. App. 1992). Premeditation and deliberation require "sufficient time to allow the defendant to take a second look." *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992). Premeditation and deliberation may be inferred from the circumstances surrounding the killing. Furthermore, premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the killing. *Id.*

Viewing the evidence in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could certainly have found Petitioner guilty beyond a reasonable doubt of first degree murder. As the Michigan Court of Appeals observed:

> viewed most favorably to the prosecution, the evidence here showed that the decedent attempted to have a conversation with defendants Sherman and Campbell and that he was shot several times in the back as he was leaving. Premeditation and deliberation may be inferred from the circumstances. The evidence that the decedent was shot while he was retreating was sufficient to allow the jury to infer that defendant Sherman had time to reconsider his actions.

*People v. Sherman*, No. 231994, Opinion at 4 (Mich. Ct. App., Aug. 16, 2002).

This determination by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. The Court concludes, therefore, that the trial court did not err by submitting this charge to the jury. *See*

14

*Johnson v. Hofbauer*, 159 F.Supp.2d 582, 596-97 (E.D. Mich. 2001) (recognizing that where the evidence would support a conviction on a particular charge, it does not constitute error to submit the resolution of such charge to the jury). Accordingly, this claim raises no issue upon which habeas relief may be granted.

**II.        Jury Instructions**

Petitioner was charged with first degree murder, but the trial judge instructed the jury that it "may consider" the lesser included offense of second degree murder. (Trial Transcript, October 26, 2000, 14-17). Petitioner asserts that the trial judge erred by failing to further instruct the jury as to the lesser included offense of manslaughter.

As is well recognized, "generally, federal habeas relief is not available for errors of state law, such as claims for failure to instruct on a lesser included offense." *Williams v. Withrow*, 328 F.Supp.2d 735, 748 (E.D. Mich. 2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)). To obtain relief in such a circumstance, Petitioner must establish that the alleged error rendered his trial "fundamentally unfair." *Williams*, 328 F.Supp.2d at 748. As the Sixth Circuit has observed, however, "failure to instruct on a lesser included offense in a noncapital case is not 'such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'" *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002). Accordingly, this claim raises no issue upon which habeas relief may be granted.

**III.**         **Ineffective Assistance of Counsel**

Petitioner asserts that his attorney rendered ineffective assistance by failing to request that the jury be provided an instruction on the charge of voluntary manslaughter.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

After the presentation of evidence and before the jury was instructed, the trial judge spoke with the parties (outside the presence of the jury) concerning jury instructions. The trial judge stated, "[l]et's discuss charges, if you will. I know that there has to be a mandatory second degree. Anything else wished to be included by either party?" (Trial Transcript, October 25, 2000, 170-71). Neither party indicated that it sought the inclusion of "anything else." (Tr. 171). The trial judge

then stated, "[h]earing nothing, it should be first degree and then the lesser included offense of second degree." (Tr. 171). After the jury was instructed, the trial judge asked the parties whether they had any "comments, corrections, requests or objections?" (Trial Transcript, October 26, 2000, 31). In response, the following exchange occurred between Petitioner's counsel and the trial judge:

> Counsel: I'm satisfied that the court has given the instructions - satisfied they were given properly. I would like to indicate that for the record that Mr. Sherman, this morning, after having thought about it over night, apparently although we did discuss it yesterday, he inquired as to whether the instructions would allow - manslaughter could be given together. As the court knows I made that known to the court and the court informed me that it could not be given at this point as we had already argued and have (inaudible) to the jury. I think that's a matter we need to put on the record [and] I thank the court for the opportunity to do so.
>
> The Court: Okay. That indeed was the discussion that we did have a little earlier before the Jury was brought out. And the reason that that can't be done at this juncture is, that we would have to argue all over whatever theory that somebody might have wanted to change or import and would have - the time to decide that is before we argue and before the Jury has a chance to deliberate. So that's why I didn't concur with the request of Counsel.

(Trial Transcript, October 26, 2000, 31-32).

Based on the above exchange, the Michigan Court of Appeals concluded that "it is

17

apparent from the record that defendant Sherman participated in counsel's decision not to request a manslaughter instruction, and then later changed his mind." *People v. Sherman*, No. 231994, Opinion at 5 (Mich. Ct. App., Aug. 16, 2002). The court further observed that "[t]he initial decision not to request a manslaughter instruction was one of trial strategy and defendant has not overcome the presumption that this strategy was reasonable." The court, therefore, rejected Petitioner's ineffective assistance claim on the ground that counsel's performance was not deficient. *Id.*

Because Petitioner did not request a Ginther hearing as part of his state court appeals, he has failed to develop or present facts supporting the argument that the decision not to request a manslaughter instruction was either unreasonable or against his wishes. There is likewise no indication that Petitioner made any subsequent attempt to uncover or develop facts relevant to this claim. As noted above, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." As the Michigan Court of Appeals determined, the record indicates that the decision not to request a manslaughter instruction was a strategic decision made by Petitioner and his attorney. Petitioner has failed to present evidence or argument calling into question this presumption.

Thus, Petitioner has failed to establish that the decision by the Michigan Court of Appeals, that counsel's performance was not deficient, is contrary to, or involves an unreasonable application of, clearly established federal law or is based on an unreasonable determination of the facts in light of the evidence presented. However, even if the Court assumes that the decision not to request a manslaughter instruction constituted deficient performance, the result is the same as Petitioner cannot establish that he suffered prejudice resulting therefrom.

To establish prejudice, Petitioner must establish that there exists "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." In other words, Petitioner would have to demonstrate that there exists a reasonable probability that the jury would have found Petitioner guilty of voluntary manslaughter (instead of second degree murder) if given the opportunity.

As of February 2000, the elements of the offense of voluntary manslaughter were: (1) the defendant killed the victim in the heat of passion; (2) the passion was caused by an adequate provocation; (3) the killing occurred before a reasonable time had passed to allow the heat of passion to subside; and (4) the defendant possessed the intent to kill or commit serious bodily harm. *See People v. Robinson*, 1999 WL 33429996 at *1 (Mich. Ct. App., Nov. 16, 1999) (citations omitted). As the Michigan Court of Appeals observed, the evidence that Card was shot in the back while "retreating" demonstrated that Petitioner had ample opportunity to "reconsider his actions" before shooting Card. *People v. Sherman*, No. 231994, Opinion at 4 (Mich. Ct. App., Aug. 16, 2002). The evidence presented at trial more than supports Petitioner's conviction for second degree murder and there does not exist a reasonable probability that the jury would have convicted Petitioner of manslaughter if given the opportunity.

The conclusion by the Michigan Court of Appeals that Petitioner was not deprived of the right to the effective assistance of counsel is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

19

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Sherman's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  June 26, 2009                     /s/ Ellen S. Carmody
                                         ELLEN S. CARMODY
                                         United States Magistrate Judge